UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TENNESSEE CHATTANOOGA DIVISION

| | |
|---|---|
| JOHN DOE, by and through his next friend JANE DOE, | Case No. 1:16-cv-00373 |
| Plaintiff, | Hon. Judge H. Mattice<br>Hon. Mag. Judge C. Steger v. |
| HAMILTON COUNTY BOARD OF EDUCATION, *et al.*, | |
| Defendants. | |

*Consolidated with:*

| | |
|---|---|
| RICHARD ROE, a minor student, by and through his parents and next friends, RICHARD ROE, SR. and JANE ROE, | Case No. 1:16-cv-00497 |
| Plaintiff, | v. |
| HAMILTON COUNTY DEPARTMENT OF EDUCATION, *et al.*, | |
| Defendants. | |

**PLAINTIFF ROE'S RESPONSE IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT FILED BY HBOE AND MARSHA DRAKE**

**COME THE PLAINTIFFS, RICHARD ROE,[1] RICHARD ROE, SR. AND JANE ROE,** and file this Response to the motion for summary judgment of HCBOE and Marsha Drake. They show:

---

[1] In depositions, Richard Roe may be identified as "Student G."

1

# I. INTRODUCTION

As this Court is aware, Plaintiffs Doe and Roe have filed a joint motion for partial summary judgment under Title IX and Section 1983 failure to train. (Doc No. 178-79.) Plaintiff Roe has also filed a response to the individual Defendants' motion for summary judgment contemporaneously with this Response (Doc. No. 184.) To be efficient, Plaintiffs incorporate their motion for partial summary judgment, response to the individual Defendants' motion for summary judgment, and the supporting evidence without reciting all of the facts, evidence, and arguments contained therein. *See* Fed. R. Civ. P. 10(c).

This response is filed by the Roe Plaintiffs, with Doe filing separately. Plaintiffs note that HCDE's motion for summary judgment contains pages of "facts" which, really, are more *advocacy* and, many times, are not *undisputed* or, at least, are subject to many different inferences, making it inappropriate for summary judgment.

# II. FAILURE TO TRAIN UNDER § 1983

As stated in Plaintiffs' motion for partial summary judgment, HCDE grossly failed to train at the coaching and administrative levels despite the tremendous need for it at Ooltewah High School (OHS).

**A.  The Policies at HCDE Are Legally Insufficient**

Before reaching training, of course, one must determine whether the *existing* policies on sexual assault and bullying were legally and practically sufficient.

For this, Plaintiffs hired renowned expert, Dr. Charole Shakeshaft, to review the policies and training at HCDE. Dr. Shakeshaft, in her report, opines that "the HCDE Board policies are not in full compliance." (Ex. A, Shakeshaft Supp. Report, p. 46; *see also* Doc. No. 160-1, Shakeshaft Report.) "To meet Title IX requirements, the policy regarding harassment and sexual

2

harassment needs to include a statement that inquiries concerning Title IX may be referred to the school's Title IX coordinator, and list the name and contact information for that person . . . . Additionally, Tennessee statute T.C.A. § 49-6-4503 requires a statement of consequences and appropriate remedial action for a person found to have committed any act of harassment, intimidation or bullying. HCDE's policy that addresses student discrimination, harassment, intimidation or bullying does not include such a statement." (*Id.*) Therefore, she recommends the following occur:

- State that sexual harassment is covered both on and off school grounds;
- Describe clearly who is covered by the sexual harassment;
- Expand the mandated reporting policy to include mandating a report on the action taken for each allegation that is reported;
- Mandate that reports be kept in a central location;
- Clarify expectations on touching and social media;
- Provide a list of sanctions and penalties for violating policies;
- State that sanctions apply to all students;
- Clearly list possible consequences for failing to report or act promptly on an allegation;
- Include a statement concerning the impact of sexual harassment;
- Provide a statement outlining legal remedies available to the complainants;
- Indicate support services available to victims of peer sexual harassment;
- Mandate the annual training of school staff for preventing sexual harassment;
- Mandate the annual training of school students and parents for preventing sexual harassment; and
- Outline a plan of policy review, evaluation and improvement; and
- Make it clear that the entire school family is responsible for identification and reporting.

(*Id.*)

**B. Training Was Woefully Insufficient, Hazing Was Not Understood, Reporting Channels Were Unclear, Sexual Harassment Training Did Not Occur, Mandatory Reporting Channel Training Was Insufficient, and There Exists a Lack of Commitment to Bullying Education by the Core Team.**

Dr. Shakeshaft also examined the training that is expected of a school system, and what was and was not done by HCDE. (*Id.* at pp. 47-58.) First, she agreed with the District Attorney's

conclusion that there is a "glaring lack of training" regarding the duty to report child abuse, with volunteers like Karl Williams being provided no training. (*Id.* at p. 54.) Second, the players themselves claimed to understand "bullying" but believed "racking in" was "horseplay" or "boys being boys." (*Id.*) Thus, the boys had a "desensitization and minimization of the behavior" and what may constitute "hazing." (*Id.*)

In her "Findings" section, she opined on the lack of hazing training, students not understanding to whom or how to report harassment, lack of sexual harassment training of staff, lack of mandated reporter training for child abuse, and the lack of follow-through and seriousness of the CORE team responsible for bullying education and prevention:

- "Ms. Bullard found a lack of understanding of the concept of hazing across the student body and an attitude of denial from some administrators that hazing is legitimate issue at the school, specifically in the basketball program, that needs to be addressed. I concur with her conclusions and recommend expanding training to be more comprehensive around the concept of hazing, particularly for male athletes, faculty, administrators and coaches."

- "Students also need to understand who to report to and feel safe that there will not be any retaliation for reporting. This should be incorporated into the training materials as well, with a clear statement of commitment that student protection is of the highest priority."

- "Sexual harassment training was not mandated in the policy. Staff received the Harassment/Sexual Harassment and Discrimination Board policy but were not trained on the topic. Sexual harassment training should be mandated, and administrators tasked with investigating reports of sexual harassment must be adequately trained."

- I concur with Attorney General Pinkston's conclusion that the mandated reporter training was not effective. Certain employees who were trained were not familiar with the term "mandatory reporting." Mr. Pinkston also found that volunteers received no training on the subject. All employees, staff, administrators, faculty, coaches, and volunteers must be trained and well versed regarding the legal requirement to report known or suspected child abuse or child sexual abuse, how to identify abuse, how and when to report, and what happens after a report has been made.

- The follow through of OHS' core team responsible for ramping up the bullying

4

education and prevention efforts at OHS have been inconsistent, in part because there seems to be a lack of commitment or on the part of administration. (For example, the core team training was cut from 2 days to 6 hours and there was no school administrator assigned to the core team.) HCDE should mandate the use Olweus bullying program across the district to ensure consistent and effective training and follow-through.

(*Id*. at p. 57.)

**C.    Coach Montgomery Was Not Trained**

Consistently, Coach Montgomery himself has admitted lack of training by HCDE for every conceivable aspect of sexual harassment. He believed Title IX merely meant "the same amount of programs for men and women." (Doc. No. 178-7, pp. 15-19.) He testified to no training being given to the players, or knowledge of any applicable policies. (*Id*. at pp. 18-19.)

**D.    HCDE's Title IX Coordinator Was Not Trained**

On the administrative level, HCDE's Title IX Coordinator, Marsha Drake, had no Title IX training at all. (Doc. No. 178-4, p. 23). Like Montgomery, she thought Title IX involved gender equity in sports programs, like time on a softball or baseball field. (*Id*. at 24.) She knew *nothing else* about Title IX. (*Id*.)

**E.    The Surveys at OHS Prior to the Attacks Upon Roe and Doe**

As Roe pointed out in moving for partial summary judgment, HCDE received a school-specific bullying survey from the Ooltewah High students in November of 2014. That survey has a "high degree of reliability" and showed 16% of Ooltewah high school students reported being bullied at least once or twice a month. (Doc. No. 178-6, Ex. 51.) Twenty-seven percent (27%) of Ooltewah High students said they would *not* feel comfortable reporting bullying. (*Id*. at Ex. 53.) Sixty-eight percent (68%) of the ninth grade students like Roe and Doe reported being bullied either monthly or weekly at Ooltewah High School. (*Id*. at Ex. 54.) For tenth grade, 62.1% reported being bullied. For eleventh grade, it was 66.87%. And for seniors, it was 60.14%. (*Id*.)

5

**F.     HCDE Is Estopped from Denying Adverse Findings Related to Training**

Magistrate Judge Steger addressed the dual roles of Attorney Courtney Bullard as an agent/attorney for HCDE and, later, a Rule 26 expert for HCDE. *Doe v. Hamilton Cty. Bd. of Educ.*, 2018 U.S. Dist. LEXIS 11117, at *4 (E.D. Tenn. Jan. 12, 2018). This dual role "accentuated" her mental impressions and opinions. *Id*. at *12.

A perplexing issue in this case is how HCDE designates Ms. Bullard as its expert, but ignores Ms. Bullard's liability *findings*. Months *after* the Gatlinburg attacks, Ms. Bullard could not discern "what efforts were being made with respect to HCDE meeting its Title IX obligations." (Doc. No. 178-3, Bullard Report, p. 19.) Ms. Drake led Bullard to conclude "very little" was being done. (*Id*.) Ms. Drake "has not received adequate training on Title IX" and HCDE "designated her as coordinator without the consideration of the appropriate infrastructure, support and training." (*Id*.)

While Ms. Bullard later learned that Ms. Marsha Glenn was "doing a lot of work that would satisfy some of the HCDE's Title IX obligations," she correctly found this would be very difficult for parents or students to locate or understand. (*Id*.) In fact, not even Ms. Glenn knew it. (*Id*.) Thus, overall, Ms. Bullard "found that the HCDE's and OHS's efforts towards training on sex and gender-based harassment, including obligations of the school district in responding to those complaints under Title IX, are ***inadequate in some areas, disjointed in others and overall in need of improvement.***" (*Id*. at pp. 19-20 (emphasis added).)

**G.     HCDE Speculates that Training Would Not Matter—Of Course it Would**

HCBOE does not even argue it adequately trained its personnel. It cannot. Instead, it speculates that its *lack* of training would not have prevented any harm anyway. Such speculation is hardly grounds for summary judgment.

6

Nevertheless, HCBOE writes, "Plaintiffs offer no definitive proof of how the school personnel's alleged lack of training either caused or contributed to the incident that is the subject of this lawsuit, or how any additional training could have prevented it." (Doc. No. 177-1, p. 17.) Importantly, the law does not view a lack of training as dismissively as does HCBOE—nor is "definitive proof" required at summary judgment; Plaintiffs' burden, of course, is to raise genuine issues of material fact, with factual inferences in favor of the non-movant.

Under a Section 1983 failure to train theory, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Had HCDE provided training to coaches, *or players*, about harassment of or by teenage males—what constitutes gender-based harassment, how it is *not* to be tolerated, to whom a report should be made, and consequences such as expulsion of the offenders—it is entirely reasonable to assume that the escalation into physical violence with the pool stick would have been avoided. Put differently, HCDE cannot simply assume that the training would have failed.

The jury may reach a different conclusion, and almost certainly will. That is, if, as Dr. Shakeshaft found, there had been appropriate training on hazing, if students did understand how to report and whom to report sexual harassment, if sexual harassment training had been provided to staff, along with training on mandated reporter training for child abuse, and if there had been diligent follow through and seriousness of the CORE team responsible for bullying education and prevention, it is almost certain that any hazing and bullying and sexual harassment would have been rooted out early.

7

As the *Doe v. Forest Hills* Court pointed out, the training analysis requires the "admittedly difficult task of 'predicting how a hypothetically well-trained [person] would have acted under the circumstances.'" *Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321, at *56 (W.D. Mich. Mar. 31, 2015) (citing *City of Canton*, 489 U.S. at 391). Surely a "well-trained person," coaches or players, could prevent a history of hazing ("racking in") which ultimately culminated in sexual violence. For example, if Roe had known it was acceptable to report gender-based rackings (assaults to "make you a man"), how to report them, and to whom he should report, then it inexorably follows that intervention would have occurred prior to the Gatlinburg attacks. There is nothing unreasonable about that inference. Similarly, the failure of HCDE staff to understand the basic tenent that Title IX applies to claims *of sexual harassment*, not simply gender equity in sports participation, created a situation where HDCE could not have informed students of their rights. *See Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 662 (W.D. Tex. 2017); *see also* **Doe v. Claiborne County,** 103 F.3d 495, 514 (6th Cir. 1996) (quoting Office of Civil Rights guidance defining Title IX sexual harassment as "consisting of verbal or physical conduct of a sexual nature, imposed on the basis of sex").

Moreover, if Coach Montgomery had been trained that Title IX prohibits gender-based harassment, and how to advise his players, with attendant consequences, then surely the tradition of "rackings" would have come to a stop and the Gatlinburg attacks prevented. Otherwise, if one takes a "training doesn't matter attitude," as HCDE does, then training becomes superfluous. Public policy hardly supports such a stance. The result is precisely what Dr. Shakeshaft found— a lack of seriousness to the attendant subjects.

Even so, HCDE wants to argue that teenage threats and violence is *unforeseeable*. That stance is little more than "learned helplessness," or victimhood. With due respect, it is highly foreseeable at the male, high-school level that hazing, violence, and bullying can occur absent policies and prevention. At Ooltewah, in particular, as Plaintiffs' partial summary judgment evidence points out, staggering numbers of students believe they *are* regular victims of bullying at the school. (*See* p. 5, *supra*.) Armed with this evidence of perceived bullying by students, the emphasis on training was even *more* important, and HCDE's failure, even more deliberately indifferent.

Moreover, evidence supports Coach Montgomery knowing of the rackings. At a minimum, there were occasions where a racking was actually taking place, the lights were out, and Coach Montgomery came in and flipped on the lights. (Doc. No. 178-1, Richard Roe, Jr. Dep., p. 198.) According to Plaintiff Roe, Coach Montgomery did not undertake any investigation or any discipline either. (*Id*.) Roe viewed Coach Montgomery and Coach Williams "more like buddies," not disciplinarians. (*Id*. at 200.) If stronger discipline had occurred at the beginning of the season, Roe believes—and the inference is infinitely reasonable—the attacks at Gatlinburg never would have occurred. (*Id*.)

The Bullard Report also lists a number of circumstances that lead inevitably to the conclusion that Coach Montgomery was aware of the rackings. His office was adjacent to the locker room, making it "unlikely that he would not hear the players banging around in the locker room," including one incident where a television was broken. (Doc. No. 178-3, Bullard Report, p. 10.) In addition to Roe's report of Coach Montgomery walking in on racking once, a player reported to Bullard that he "walked in several times when the lights were off, turned them on and

9

told the team to knock it off." (*Id.*) Players told Bullard that the team was disciplined for racking and they often spoke about rackings in from of the coaches. (*Id.*)

Finally, Coach Montgomery's attitude toward the rackings may be viewed through the lens of his attitude toward the pool stick attacks. After John Doe was attacked, Montgomery told Richard Roe to "keep this on the low" and "don't let this get out." (*Id.* at 201.) He also minimized what amounted to a goring of John Doe as "horseplay." (*Id.*)

Defendant Nayadley, too, was aware of the rackings. As athletic director, he was responsible for ensuring there was no hazing in any of OHS's athletic programs. However, as the immediate past coach of the OHS basketball team, he was uniquely placed to know about, and stop, the hazing on the basketball team. As both Bullard and Shakeshaft concluded, there was a "long-standing culture" of hazing and "rackings" on the OHS varsity basketball team, dating back through Nayadley's tenures as AD and head coach and beyond. (Ex. A., Shakeshaft Supp. Report, p. 60; Doc. No. 178-3, Bullard Report, pp. 7, 11-12.) In fact, Dr. Shakeshaft noted a former player who reported, "[T]he abusive behaviors were embedded in the team's culture and that back then, Mr. Nayadley was then the head coach and Mr. Montgomery was the assistant coach and that they 'were fully aware of what was going on and in some ways encouraged [it].'" (Ex. A., Shakeshaft Supp. Report, p. 23.) Another parent stated that they had reported the beatings directly to Defendant Nayadley, "but nothing was done to address the issue." (*Id.*)

Given the totality of the circumstances about Defendants' knowledge, Dr. Shakeshaft concluded, "Given coach proximity to student athletes, athlete's being hazed 'in the open,' and a known history of hazing, it is clear that coaches and building administrators were well aware that hazing was happening. None of them tried to stop it." (Pls.' Resp. HCDE Mot. Sum. Judg., Ex.

A., Shakeshaft Supp. Report, p. 60.) Had HCDE offered proper Title IX training to its staff that was "well aware" of the hazing, more could have been done to stop it.

For all these reasons, summary judgment cannot possible be rendered to HCDE.

## IV. TITLE IX: HCDE ADMITS, AND THE FACTS SHOW, DELIBERATE INDIFFERENCE

Both parties cite *Lopez v. Metro. Gov't*, 646 F. Supp. 2d 891, 918 (M.D. Tenn. 2009). *Lopez* articulates that Title IX liability can flow from two "harassment" time periods: (1) when the school exhibits deliberate indifference *before* a harassing attack on a student by a fellow student, in a way that makes the student more vulnerable to the attack; and (2) when a school exhibits deliberate indifference after a harassing attack that causes a student to endure additional harassment. *Lopez*, 646 F.Supp.2d at 917; see also, *Belcher v. Robertson Cty.*, No. 3-13-0161, 2014 U.S. Dist. LEXIS 165238, at *24 (M.D. Tenn. Nov. 26, 2014) (citing both time periods). "These claims do not require proof that the defendant fully appreciated the harmful consequences of that discrimination, because deliberate indifference is not the same as action (or inaction) taken maliciously or sadistically for the very purpose of causing harm." *Shively v. Green Local Sch. Dist.*, 579 F. App'x 348, 357 (6th Cir. 2014).

### A. Deliberate Indifference *Before* the Harassment

Plaintiffs incorporate all of the evidence set forth above, including the opinions of Dr. Shakeshaft, concerning the overwhelming failure to train, resulting in increased vulnerability of the ninth-grade players. With no training and the lack of seriousness, the "racking" tradition went unchecked and, eventually, led to extreme violence with the pool sticks.

11

### B. Deliberate Indifference *After* the Harassment

Plaintiffs point out that they do not have to prove even *more assaults* occurred after the pool stick. Rather, if the action or inaction by the school renders them "vulnerable to future harassment and [they] leave school," this is sufficient for liability. *Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 660 (W.D. Tex. 2017). The Baylor University court cited a number of cases showing that placing undue emphasis on further harassment runs counter to the goals of Title IX and penalizes the sexual harassment victim who takes steps to avoid the harassment by withdrawing from school. *Id.*

For Roe, as Plaintiffs' anticipated, HCBOE's motion contradicts the findings of its own agent and Rule 26 Expert, Ms. Courtney Bullard. HCDE, through Bullard, found that the administrators "failed to take appropriate measures to address the effects of the hazing, bullying and sexual harassment of [Roe]." (Doc. No. 178-3, Bullard Report, p. 14.)[2] HCDE did not "exercise appropriate judgment and take necessary measures to ensure the mental and physical well-being of the players who were the target of bullying, hazing and sexual harassment." (*Id.* at p. 13.)

HCDE had failed to offer any explanation, comfort, or counseling to Roe. (Doc. No. 178-1, Richard Roe, Jr. Dep., p. 163; Doc.. No. 178-9, Richard Roe, Sr. Dep., p.21; Doc. No178-10, Jane Roe Dep., p. 35.). The Roe parents did not learn their son was sexually assaulted until after the basketball tournament concluded, and Roe was returning home. (*Id.*)

---

[2] Ms. Bullard's report separates post-assault liability under Title IX for John Doe (the "Physically Injured Freshman") from Richard Roe (one of the "Remaining Freshman"). (Doc. No. 178-3, Bullard Report, p. 12.)

The stunning failure to investigate the harassment of Roe led, foreseeably, to no one checking on his well-being at all. So, three months later, when Bullard was hired, she found the principal, Jarvis, would not contact any player's family "unless he had news for them regarding the upcoming basketball season." (Doc. No. 178-3, Bullard Report, pp. 14-15.) Hoping Mr. Scott Bennett, HCDE's counsel, might have more pull, Bullard noted that when Bennett, "attempted to convince Principal Jarvis of the necessity of speaking to [the Roe] famil[y]," he failed to understand and refused to do it. (*Id*.)

The "Bullard report" and "Bennett emails" vividly capture HCDE's stance of indifference with respect to Roe. (Doc. No. 178-8, Bennett Emails.) In April 2016, now many months removed from the attacks, Bennett pointed out that "other students are said to have suffered sexual battery," and that all were hazed. (*Id*.) So indifferent was Jarvis that Bennett famously wrote that no other principal in the "entire district" would take this stance. (*Id*. at 000276.) And later expressed his frustration in extreme terms. (Id. at 000270.) The central office was little better, described by Bennett as "pushing chain." (*Id.* at 000272.) Finally, Bennett became so exasperated with Jarvis that he said, "I am about ready to shoot Jarvis in the head." (*Id*. at 000270.)

HCDE's motion says "Student A, B, and C's parents were called," but not Roe (Student G). (Doc. No. 177-1, p. 22.) It says the perpetrators were "Zero Toleranced." (*Id*.) But it uses the decision by Roe (and Doe) to leave the team as evidence *not* of HCDE's historical indifference and failures, but as a remedial measure for lack of future contact. Taking some action against the perpetrators does not prove HCDE was not deliberately indifferent to Roe. As Roe's parents' experience, Roe's experience, Bullard's experience, and Bennett's experience all show, HCDE, through its highest ranking official stationed at OHS, Mr. Jarvis, was deliberately indifferent to

13

the injuries of Roe and his well-being. This being the conclusion of HCDE, through Bullard, it is bound by this finding.

For all these reasons, not only is summary judgment not appropriate for HCDE, but it is appropriate for Plaintiffs considering the undisputed facts both before and after all of the harassment.

V. MARSHA DRAKE, TITLE IX COORDINATOR, INDIVIDUALLY

HCDE argues Marsha Drake, the Title IX coordinator, may not be held individually liable under section 1983 because "failure to act is not sufficient." (*Id*. at p. 19 (citing *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002)).) That quotation warrants further exploration. Actually, where a statute imposes a *duty to act*, then liability for failing to act will attach.

> A "duty" under "color of law" must be a distinct element of a section 1983 case alleging a "failure to act." That is, a plaintiff must show that an individual defendant failed to act under color of law. If state law does not impose a duty to take action, "there is no conduit through which an exercise of state power can be said to have caused the constitutional injury."

*Emmerick v. Seals*, No. 3:07cv-417, 2008 U.S. Dist. LEXIS 118315, at *8-9 (E.D. Tenn. Nov. 3, 2008); *see also Doe v. Claiborne County,* 103 F.3d 495, 512 (6th Cir. 1996).

Using passive voice ("failure to act") versus active voice ("refusal to act") is imprecise and legally unhelpful. It is better to focus on whether affirmative *duties* exist. Title IX does impose affirmative duties on a Title IX coordinator. The Title IX coordinator must carry out the responsibilities for HCDE under Title IX. 34 C.F.R. § 106.8(a). He or she must be independent, and it is the Title IX coordinator's responsibility to "coordinate the recipient's compliance with Title IX" and "coordinat[e] the recipient's responses to all complaints involving possible sex discrimination . . . . [including] monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate." *See* April 15, 2015, "Dear Colleague Letter," from

14

USDOE, *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf (last visited March 27, 2018).

Thus, this is a situation where Marsha Drake refused to train herself as to the functions of a Title IX coordinator or to perform her job of training others, monitoring, and identifying campus climate and patterns. She accepted the *title* of "Title IX Coordinator," but refused to learn the job. Her active *refusal* to act (or passive *failure* to act) was so grave that an independent lawyer, Ms. Bullard, was hired to undertake what Drake had ignored. Because the whole Title IX system functions through a Title IX coordinator performing these independent responsibilities, she cannot diffuse her liability under Section 1983 by arguing her failures are "insufficient" through the use of passive voice.

## VI. STATE LAW CLAIMS

The Court will note that Plaintiffs did not move for summary judgment on the state law claims under the Governmental Tort Liability Act. That is because "foreseeability is a question of fact . . . ." *Moore v. Hous. Cty. Bd. of Educ.*, 358 S.W.3d 612, 619 (Tenn. Ct. App. 2011). Thus, questions of fact are not proper for summary judgment under Fed. R. Civ. P. 56. The *Moore* court explained:

> Tennessee does not impose upon teachers and school systems the duty to anticipate or foresee the hundreds of unexpected student acts that occur daily in our public schools . . . ; **however, we have no hesitation in holding a teacher or local school system to the duty of safeguarding students from reasonably foreseeable dangerous conditions including the dangerous acts of fellow students.** *Mason ex rel. Mason v. Metro. Gov't of Nashville and Davidson County*, 189 S.W.3d 217, 224 (Tenn. Ct. App. 2005).

> Moreover, "the foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred." *Id*. at 222 (citing *McClenahan*, 806 S.W.2d at 775).

*Id.* at 619 (emphasis added).

For foreseeability evidence in this case, Plaintiffs incorporate the previous evidence of the climate surveys showing the epidemic of bullying at OHS. Additionally, they incorporate the evidence of the historical "rackings" through the years perpetrated on freshmen; the evidence of Coach Montgomery turning on the lights during a racking and conducting no discipline; and, at Gatlinburg, leaving the students alone without any supervision. Finally, the lack of remedial measures toward Plaintiff Roe is incorporated too. Given all of this evidence, it was entirely foreseeable that a freshman could suffer injury at the hands of an upperclassmen. As *Moore* states, the "exact manner in which the injury takes place" is not a part of the foreseeability analysis. Accordingly, summary judgment must be denied.

Last, HCDE argues that immunity under GTLA is not removed for actions involving "civil rights." (Doc. No. 177-1, p. 26 (citing *Campbell v. Anderson County,* 695 F. Supp. 2d 764, 777-779 (E.D. Tenn. 2010)).) However, if immunity exists for HCDE, then individual liability exists for the individual defendants. *Colson v. City of Alcoa*, 2017 U.S. Dist. LEXIS 66339, at *41 (E.D. Tenn. May 2, 2017). Conversely, if the court somehow granted summary judgment under Section 1983 and Title IX, which Plaintiffs do not believe would be appropriate, then there would not be a "civil rights" claim to avoid the removal of immunity. *Id.*

## IV. CONCLUSION

As requested in his own motion for partial summary judgment, Richard Roe, Jr. is entitled to summary judgment under Title IX for the gender and sexually hostile environment. HCDE's motion for summary judgment must be denied.

Respectfully submitted,

**GILBERT McWHERTER SCOTT BOBBITT, PLC**

s/ Justin S. Gilbert

Justin S. Gilbert (BPR No. 17079)
200 W. Martin Luther King Blvd., Ste. 1067
Chattanooga, TN 37402
(423) 499-3044 (phone) (731) 664-1540 (fax)
jgilbert@gilbertfirm.com

**LEWIS & OLIVER**

s/ Eric J. Oliver

Eric J. Oliver (TN Bar No. 017509)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
(423) 756-8203 (phone) (423) 756-2233 (fax)
eoliver@lewisoliver.com

*Attorneys for Plaintiffs Roe*

17

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent to the following via the Court's Electronic Filing System on April 2, 2018:

| | |
|---|---|
| D. Scott Bennett<br>Mary C. DeCamp<br>Bennett & DeCamp<br>707 Georgia Ave., Suite 300<br>Chattanooga, Tennessee 37402<br>Scott.bennett@leitnerfirm.com<br>Mary.decamp@leitnerfirm.com<br><br>Arthur F. Knight, III Jonathan S. Taylor<br>TAYLOR & KNIGHT, P.C.<br>800 South Gay Street, Suite 600 Knoxville, Tennessee 37929 aknight@taylorknightlaw.com<br>jstaylor@taylorknightlaw.com<br><br>Charles M. Purcell<br>Jennifer C. Craig<br>Christopher C. Hayden<br>PURCELL, SELLERS & CRAIG, INC.<br>P.O. Box 10547<br>Jackson, Tennessee 38308 chuck@psclegal.com<br>jennifer@psclegal.com chris@psclegal.com<br><br>W. Carl Spinning<br>T. William Caldwell<br>ORTALE KELLEY LAW FIRM<br>330 Commerce Street, Suite 110<br>P.O. Box 198985<br>Nashville, Tennessee 37201-8985<br>wcaldwell@ortalekelley.com<br>cspinning@ortalekelley.com | Jordan K. Crews<br>Brian A. Pierce<br>Office of the Attorney General<br>General Civil Division<br>P.O. Box 20207<br>Nashville, Tennessee 37202-0207<br>Jordan.crews@ag.tn.gov<br>Brian.Pierce@ag.tn.gov<br><br>Jaclyn L. McAndrew<br>Heather Ross<br>Office of Attorney General and Reporter<br>P.O. Box 20207<br>Nashville, Tennessee 37202-0207<br>Jaclyn.mcandrew@ag.tn.gov<br>Heather.Ross@ag.tn.gov<br><br>Rhubin M. Taylor<br>Office of the County Attorney<br>Room 204, County Courthouse Chattanooga, Tennessee 37402<br>mtaylor@mail.hamiltontn.gov<br><br>Edmund J. Schmidt III<br>LAW OFFICE OF EDDIE SCHMIDT<br>2323 21st Avenue South<br>Suite 502<br>Nashville, Tennessee 37212<br>eddie@eschmidtlaw.com<br><br>Curtis L. Bowe, III<br>BOWE & ASSOCIATES, PLLC<br>707 Georgia Avenue, Suite 301 Chattanooga, Tennessee 37402<br>curtisbowe@boweandassociates.com |

s/ Justin S. Gilbert